**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Robert Poage,<br><br>  Plaintiff,<br><br>v.<br><br>Computer Sciences Corporation,<br><br>  Defendant. | No. CV-14-02602-PHX-DLR<br><br>**ORDER** |

Before the Court are Plaintiff's Motion for Partial Summary Judgment, (Doc. 47), and Defendant's Motion for Summary Judgment, (Doc. 50). The motions are fully briefed.[1] For the reasons stated below, Plaintiff's motion is granted and Defendant's motion is denied.[2]

**BACKGROUND**

Plaintiff Robert Poage began working for Defendant Computer Sciences Corporation ("CSC") as an Account Executive in November 2004. (Doc. 63 at 4.) He eventually became an Account General Manager, responsible for client relations with a large automotive company, and served in this role until the end of his employment. (*Id.*)

---

[1] Plaintiff's request for oral argument is denied. The issues are fully briefed, and the Court finds that oral argument will not aid in the resolution of this matter. *See* LR Civ. 7.2(f); Fed. R. Civ. P. 78(b).

[2] Citations to pages in the Court's docket are to the page numbers stamped at the top of the page by the Court's CM/ECF system, not the page numbers at the bottom of each page.

As a salesperson, Poage's compensation was governed by CSC's Sales Incentive Compensation Plan ("SICP"), which "establishe[d] the performance expectations and associated incentive compensation terms for Sales, Pre-Sales and Coverage professionals who have been selected to participate . . . in the CSC Sales Incentive Compensation Plan . . . ." (Doc. 66 at 3.) If the employee met his quota for the fiscal year, he received an incentive payment based on a fixed scale. (*Id.* at 7.) Under the SICP, employees are only eligible to receive their bonus if they "remain a CSC employee until payments are made[.]" (Doc. 63 at 4.)

On August 22, 2013, CSC sent an email to all of its employees detailing a new compensation incentive opportunity: the Million Dollar Challenge ("MDC"). (Doc. 48, ¶ 6.) The MDC provided that employees "who achieve $1M in FY14 revenue above the full-year forecast" would receive $15,000 for the first $1 million of incremental revenue and an additional 1.5% of every additional $1 of revenue above the initial $1 million. (Doc. 48-1 at 13.) The MDC further stated that the "[i]ncentive will be calculated and paid at end of FY14." (*Id.*) The end of CSC's fiscal year 2014 was March 28, 2014. (Doc. 48, ¶ 12.)

Poage participated in the MDC and allegedly "performed additional sales tasks beyond his normal duties and achieved $17 million worth of new incremental revenue for the fiscal year 2014." (*Id.*, ¶ 19.) Under the terms of the MDC, he was to receive approximately $250,000 for his efforts, payable on March 28, 2014. (*Id.*, ¶¶ 20, 22.) However, on April 4, 2014, CSC informed Poage that he had two options: either voluntarily resign or be terminated. (*Id.*, ¶ 2.) That same day, Poage submitted his resignation, effective April 18, 2014. (*Id.*, ¶ 3.) Poage did not receive his MDC incentive in his last paycheck. (*Id.*, ¶ 5.) On May 30, 2014, Poage received his separate SICP bonus even though he had not been with CSC for over a month. (Doc. 52-1 at 24.) For several months, Poage emailed CSC inquiring when he would receive his MDC payment. (Doc. 48, ¶ 23.)

In September 2014, Poage contacted CSC Executive Vice President and General

1 Counsel William Deckelman, who notified Poage that he would not receive the MDC
2 payment because he was not employed on the payment date, a condition required under
3 the SICP.  (*Id.*, ¶¶ 26-27.)  CSC made MDC payments to employees that same month,
4 including a payment to one employee, Mike Hardesty, who retired from CSC before the
5 payments were made.  (*Id.*, ¶¶ 37-38; Doc. 63 at 22.)

6 On November 26, 2014, Poage filed suit against CSC alleging four counts: (1)
7 breach of contract, (2) breach of the covenant of good faith and fair dealing, (3) violation
8 of A.R.S. § 23-350, and (4) promissory estoppel.  (Doc. 1.)  On April 15, 2015, Poage
9 voluntarily dismissed count two.  (Doc. 23.)  Poage now moves for summary judgment
10 on count one, (Doc. 47), and CSC moves for summary judgment on all three remaining
11 counts, (Doc. 50).

## **LEGAL STANDARD**

13 Summary judgment is appropriate when, viewing the facts in a light most
14 favorable to the nonmoving party, "there is no genuine dispute as to any material fact and
15 the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Summary
16 judgment may also be entered "against a party who fails to make a showing sufficient to
17 establish the existence of an element essential to that party's case, and on which that
18 party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322
19 (1986).  The party seeking summary judgment "bears the initial responsibility of
20 informing the district court of the basis for its motion, and identifying those portions of
21 [the record] which it believes demonstrate the absence of a genuine issue of material
22 fact."  *Id.* at 323.  The burden then shifts to the non-movant to establish the existence of a
23 material fact.  *Id*. at 324.  The non-movant "must do more than simply show that there is
24 some metaphysical doubt as to the material facts," and instead must "come forward with
25 'specific facts showing that there is a genuine issue for trial.'"  *Matsushita Elec. Indus.
26 Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (quoting Fed. R. Civ. P. 56(e)
27 (1963)).  A dispute about a fact is "genuine" if the evidence is such that a reasonable jury
28 could return a verdict for the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 248 (1986).  When presented with cross-motions for summary judgment, "the court must consider each party's evidence, regardless under which motion the evidence is offered."  *Las Vegas Sands, LLC v. Nehme*, 632 F.3d 526, 532 (9th Cir. 2011).

## ANALYSIS

**I.  Count One – Breach of Contract**

Under Arizona law, "in an action based on breach of contract, the plaintiff has the burden of proving the existence of a contract, breach of the contract, and resulting damages."  *Chartone, Inc. v. Bernini*, 83 P.3d 1103, 1111 (Ariz. Ct. App. 2004).  Poage argues that the MDC is a valid contract and that CSC breached it by failing to pay him his incentive payment.  CSC argues this claim fails because: (1) under the SICP, Poage is ineligible to receive the payment because he was not a CSC employee at the time the MDC payments were made; and (2) the MDC is not a separate contract.  Both parties move for summary judgment on this count.

**A.  Is the MDC a Valid Contract?**

CSC argues the MDC is not a valid contract because it did not include the required contract terms and it lacks consideration.  (Doc. 50 at 10-12.)  The Court disagrees.

In its entirety, the MDC email provides:

> Effective August 22, coverage professional in all industries and regions are eligible for the following incentives (SPIFFs),
>
> Million Dollar Challenge
>
> Coverage professional in all industries and regions who achieve $1M in FY14 revenue above the full-year forecast submitted this month for their account(s) are eligible for the Million Dollar Challenge Incentive ("SPIFF").
>
> Details:
>
> - $15,000 paid to coverage professional for first $1M incremental revenue.
>
> - Additional payment of 1.5% for every additional $1 above initial $1M.

- Incremental revenue is defined as FY14 revenue above the 4+8 forecast, which includes actuals through fiscal period 4 and forecast from fiscal period 5 to fiscal period 12.

- Budgeted Currency Exchange Rate (BDL) is used to calculate incremental revenue achievement.

- Incentive will be calculated and paid at end of FY14.

- CSC will fund an offsite for manager of the team with the highest incremental revenue results.

- Managers of sales teams are not eligible for this incentive.

- AGMs, AMs & CRPs are eligible for accounts where a forecast is currently in place.

- For questions, contact global.sales.compensation@csc.com

(Doc. 48-1 at 12-13.)

By its terms, the MDC email constitutes an offer for a unilateral contract. *See* Restatement (First) of Contracts § 12 ("A unilateral contract is one in which no promisor receives a promise as consideration for his promise."). "For an enforceable contract to exist, there must be an offer, an acceptance, consideration, and sufficient specification of terms so that the obligations involved can be ascertained." *Rogus v. Lords*, 804 P.2d 133, 135 (Ariz. Ct. App. 1991). "The requirement of certainty is relevant to the ultimate element of contract formation, i.e., whether the parties manifested assent or intent to be bound." *Id.*

"An offer is a manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." *K-Line Builders, Inc. v. First Fed. Sav. & Loan Ass'n*, 677 P.2d 1317, 1320 (Ariz. Ct. App. 1983). CSC does not dispute that the MDC email sent out to employees is an offer. It clearly manifested a willingness to enter into a bargain by sending out the email and inviting employees to participate.

Acceptance is "a manifestation of assent to the terms thereof made by the offeree

in a manner invited or required by the offer." *Id.* Here, it is undisputed that Poage accepted the offer by generating approximately $17 million in additional revenue above his normal forecast.[3]

"Consideration is a benefit to the promisor or a loss or detriment to the promisee, and there is no consideration for a promise where no benefit is conferred on the promisor or a detriment suffered by the promisee." *Id.* CSC appears to argue that no consideration exists because Poage simply performed the same work he performed on a day-to-day basis. In other words, he had a pre-existing duty to generate sales revenue. (Doc. 62 at 11.) But the MDC was an incentive to go above the normal full-year sales forecast, and there is no dispute that Poage did just that. The MDC requires no more. CSC received the benefit of this additional $17 million in revenue, and this is adequate consideration to support a contract.[4]

CSC argues that several terms of the MDC are not sufficiently specific to form a contract, including: (1) administrative matters, definitional terms, corporate policies, how payments are calculated, timing of payments, and taxes. (*Id.* at 10.)[5] Indeed, "[a]n offer cannot be accepted so as to form a contract unless there is sufficient specification of terms so that the obligations involved can be ascertained." *K-Line*, 677 P.2d at 1320. Although the MDC is not exhaustive, it contains all of the *necessary* terms. *See Pyeatte v. Pyeatte*, 661 P.2d 196, 200 (Ariz. Ct. App. 1982) ("Terms necessary for the required definiteness frequently include time of performance, place of performance, price or

---

[3] CSC does not dispute the dollar amount or that Poage generated excess sales above his full-year forecast. Instead, it argues that Poage must have performed "additional sales tasks above and beyond his traditional job responsibilities." (Doc. 63 at 17.) This argument is disingenuous and would require adding a term to the MDC. The MDC required employees to earn additional revenue above the employee's standard forecast, nothing more. How the employee achieved this was up to them.

[4] CSC argues that Poage admitted that driving revenue was "part of his job," and thus he had a pre-existing duty to generate additional revenue for CSC. (Doc. 62 at 11.) This misses the point. The MDC rewarded employees who excelled at their jobs, i.e., those who drove revenue up at a higher rate. Absent the MDC, Poage only had a duty to meet his standard full-year forecast.

[5] CSC merely lists generic terms and fails to explain why such terms would be necessary in order to determine the rights and obligations of the parties.

compensation, penalty provisions, and other material requirements of the agreement."). The MDC (1) specifies what an employee must do in order to earn the incentive payment, (2) indicates how compensation will be calculated, (3) defines the term "incremental revenue" so employees understand what additional sales they will receive credit for, (4) defines who is eligible to participate, (5) states when the MDC incentive is effective, and (6) states that the incentive payment will be paid at the end of FY14. (Doc. 47 at 3.) The terms of the MDC are sufficiently certain because "they provide a basis for determining the existence of a breach and for giving an appropriate remedy." *AROK Const. Co. v. Indian Const. Servs.*, 848 P.2d 870, 877 (Ariz. Ct. App. 1993) (internal quotation marks omitted).[6] From the terms of the MDC, it can readily be determined whether Poage was eligible, what amount he is entitled to, and when the payment will be made. In addition, the MDC leaves no discretion to CSC as to whether it will make incentive payments, and thus Poage had no reason to believe he would not be compensated if he participated. *Contra* Restatement (Second) of Contracts § 45 cmt. b ("A, an insurance company, issues a bulletin to its agents, entitled 'Extra Earnings Agreement,' providing for annual bonus payments to the agents varying according to 'monthly premiums in force' and 'lapse ratio,' but reserving the right to change or discontinue the bonus, individually or collectively, with or without notice, at any time before payment. There is no offer or promise.").

CSC also argues Poage was not eligible for payment under the MDC because he was not employed on the date of payment. CSC asserts the language of the SICP should be incorporated into the MDC because the SICP applies to all incentive programs. CSC essentially seeks to add a condition precedent to payment under the MDC. But the MDC contains no such term. There is no reference to the SICP, nor does the MDC incorporate any other corporate policies or provisions, and the Court will not look outside the four

---

[6] CSC argues the time of payment term is vague and ambiguous. The Court disagrees. The MDC states payments will be made at the end of fiscal year 2014. Although an exact date is not provided, the term is specific enough to for CSC to understand its obligations under the MDC.

- 7 -

corners of the MDC.[7] Under its plain terms, Poage was eligible to participate in the MDC, and nothing in the MDC precludes payment for employees who earn their bonus but leave the company after the bonus is payable.[8]

In sum, the MDC is a valid separate contract between Poage and MDC. CSC manifested a clear intent to offer additional compensation for employees who generated revenue beyond their normal forecasts. Poage accepted the contract by earning $17 million in additional sales revenue for CSC, and the MDC contained all of the necessary terms in order to establish the rights and obligations of the parties. *Pyeatte*, 661 P.2d at 200. Poage is entitled to compensation for his performance.

## B. Remaining Elements

CSC does not dispute that it failed to pay Poage his MDC incentive payment. Nor does CSC dispute that Poage has suffered damages in the amount of approximately $250,000. These elements are satisfied. Accordingly, Poage is entitled to summary judgment on count one, breach of contract.

## II. Remaining Counts

Because Poage has prevailed on his breach of contract claim, his promissory estoppel claim is moot. With respect to Poage's claim under the Arizona Wage Law, A.R.S. § 23-355, CSC argues that Poage cannot establish that CSC had a policy or practice of paying ex-employees their MDC bonuses after termination from CSC. There is evidence that Poage received his SIPC bonus after he left CSC and that at least one other ex-employee received his MDC incentive after leaving CSC. (Doc. 48, ¶¶ 37-38;

---

[7] The Court notes the conflicting testimony from CSC employees Maguire and Deckelman regarding whether the MDC was considered a separate program from the SICP. (Doc. 57-3 at 7; Doc. 62 at 7). This is not material to the Court's inquiry, however, because the MDC is a separate contract that does not incorporate the SICP in its terms. CSC does not argue that the parol evidence rule applies, and even if it did, the Court doubts the language of the MDC is "reasonably susceptible" to CSC's interpretation. *See Taylor v. State Farm Mut. Auto. Ins. Co.*, 854 P.2d 1134, 1144-45 (Ariz. 1993).

[8] CSC's conduct also undermines its argument. Despite not being employed, Poage received his SICP bonus in May 2013, which is in direct conflict with the terms of the SICP. (Doc. 48-5 at 26.) In addition, CSC paid an employee who retired before the payments were made. (Doc. 48, ¶¶ 37-38; Doc. 63 at 22.)

1 Doc. 63 at 22.)  Consequently, evidence exists which creates a question of fact about
2 CSC's practices of paying monies under both the MDC and SICP after termination.  CSC
3 has not met its burden under Fed. R. Civ. P. 56(a), and the claim survives.

4 **IT IS ORDERED** that Plaintiff's motion for summary judgment, (Doc. 47), is
5 **GRANTED** and Defendant's motion for summary judgment, (Doc. 50), is **DENIED**.

6 **IT IS FURTHER ORDERED** that the parties shall appear at a status conference
7 on **January 12, 2016 at 4:30 PM** to discuss the issue of damages and whether Plaintiff
8 intends to pursue his Arizona Wage Law claim.

9 Dated this 14th day of December, 2015.

Douglas L. Rayes
United States District Judge